| | | |
|---|---|---|
| STEVE HANEY, | : | 4:16-cv-04113-LLP |
| Plaintiff, | : | |
| vs. | : | PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS |
| AMERICAN FAMILY MUTUAL INSURANCE COMPANY, | : | |
| Defendant. | : | |
| | : | |

Defendant American Family Mutual Insurance Company ("American Family") told Steve Haney that his roof sustained little to no damage from the June 2014 hailstorm when the storm actually caused extensive, widespread, and plainly visible damage to Haney's roof. And when American Family received information proving that its initial determination was at best, incorrect, or at worst, a lie. American Family refused to pay anything more than the demonstrably low amount previously paid. Now, American Family asks this Court to protect its interests by not following South Dakota law. And American Family attempts to do this with merit-based arguments that ignore numerous factual allegations in the Complaint that collectively establish a valid bad faith claim and the requisite implied malice to support an award for punitive damages. American Family's request must be denied.

**Standard of Review**

"[T]he court assumes that all facts in the complaint are true and construes any reasonable inferences from those facts in the light most favorable to the nonmoving party." *Burke v. Ability Ins. Co.*, 2013 WL 672564, at *2 (D.S.D. Feb. 22, 2013) (citation omitted). "To survive the motion to dismiss, the complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* at *2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And the facts alleged "in the complaint must 'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (alteration in original) (citation omitted).

**Background**

The following are the factual allegations in the Complaint that must be accepted as true: Haney purchased a homeowner's policy from American Family that was in effect at all relevant times. (Doc. 1 at ¶ 5.) In June 2014, Haney's home was damaged in a hailstorm. (Doc. 1 at ¶ 6.) That hailstorm cause "extensive, widespread, functional, and plainly visible damage to Haney's shake shingle roof." (Doc. 1 at ¶ 7.)

On July 2, 2014, American Family inspected Haney's roof. (Doc. 1 at ¶ 10.) American Family, through Adam Palace, told Haney about the results of the inspection in a July 2, 2014 letter. (Doc. 1 at ¶ 11.) That July 2, 2014 letter told Haney that there was little to no hail damage to the roof. (Doc. 1 at ¶ 12.) But the damage to Haney's roof caused by the June 2014 hailstorm was extensive and American Family knew this because it was also plainly visible. (Doc. 1 at ¶ 5.) Ignoring or recklessly disregarding the extensive and plainly visible damage, American

Family stated that $3,890.15 would properly repair the shingle damage caused by the June 2014 hailstorm. (Doc. 1 at ¶¶ 13-15, 19-20.)

Later, American Family was confronted with a report explaining that there was "significant hail damage to the cedar shakes on the entire roof." (Doc. 1 at ¶ 21.) American Family also had information establishing that $68,259.61 was needed to properly repair the damage caused by the June 2014 hailstorm. (Doc. 1 at ¶ 22.) After American Family received this information, it conducted another inspection of the roof on August 3, 2016. (Doc. 1 at ¶ 23.) The resulting report, which was dated August 4, 2016, confirmed that "Functional hail damage was evident on all slopes of this roof" even though the July 2, 2014 investigation claimed that there was *no hail damage* to some of the slopes. (Doc. 1 at ¶ 24.) Thus, American Family had two reports–one from its own expert–proving that Haney's roof sustained more damage from the June 2014 hailstorm than American Family initially identified. (Doc. 1 at ¶¶ 21, 24.) Even with this incontrovertible information, American Family said in an August 8, 2016 letter that "Nothing additional is owed on your claim" and refused to pay Haney anything more. (Doc. 1 at ¶ 28.)

Because American Family intentionally or recklessly minimized the extent of the damage caused by the June 2014 hailstorm ***and*** then refused to consider information disproving the accuracy of the initial determination, it is clear that American Family has a claims handling practice that is unlawfully biased and intentionally designed to avoid paying what it owes under its insurance policy. (Doc. 1 at ¶¶ 30-36, 47-48, 53-55.)

## Analysis

### I.   South Dakota law does not require first-party bad faith claims to satisfy heightened pleading requirements.

American Family's Brief in Support of its Motion claims that Rule 9(b)'s heightened

pleading requirement applies to bad faith claims.  (Doc. 9 at 5-7.)  In support of its argument,

American Family relies on the general phrase that "bad faith is a species of fraud."  (Doc. 9 at 6.)

Specifically, American Family cites *Jennings v. Jennings*, 309 N.W.2d 809 (S.D. 1981), *Kunkel*

*v. United Sec. Ins. Co. of N.J.*, 168 N.W.2d 723 (S.D. 1969), and a 28 year-old law review

article.[1]  None of those citations support the proposition that a traditional first-party bad faith

claim is subject to any heightened standards.

*Jennings* was a divorce case; not an insurance bad faith case.  *Jennings*, 309 N.W.2d at

809.  And the *Jennings's* use of the phrase "bad faith is a species of fraud" was part of a larger

quote from *Kunkel*.  *Id.* at 811.  Thus, American Family's argument that "bad faith is a species of

fraud" stems from *Kunkel*.  (Doc. 9 at 6.)  American Family's snippet, however, omits important

contextual information.

In *Kunkel*, the South Dakota Supreme Court stated that the "rule in some jurisdictions . . .

originates from the premise that bad faith is a species of fraud and since one is the equivalent of

the other and fraud must be proved by evidence which is clear, satisfactory and convincing, the

same rule applies to bad faith."  *Kunkel*, 168 N.W.2d at 732.  The next three sentences in *Kunkel*,

---

[1]  Roger M. Baron, *When Insurance Companies Do Bad Things: The Evolution of the "Bad Faith" Causes of Action in South Dakota*, 44 S.D. L. Rev. 471, 475 (1988-89).

4

however, expressly rejected that rule. *Id.* ("Although we have said that fraud is never presumed or lightly inferred, we have not said the burden to prove fraud required more than a preponderance of the evidence. . . . We believe this to be the proper standard of proof in this type of case and the rule in most jurisdictions.) Indeed, the Court relied on other out-of-state cases explaining that bad faith in the insurance context is different than fraudulent bad faith. *Id.*[2]

Specifically, the Court stated: "See also *Cernocky v. Ind. Ins. Co. of North Amer.*, [216 N.E.2d 198 (Ill. App. Ct. 1966)], where the court distinguished fraud and bad faith[.]" *Id.* And in *Cernocky*, the Illinois Appellate Court explained that while "[s]ome courts have held that in cases of this nature the 'bad faith' which an insured must show is for all intents and purposes equivalent to fraud. . . . We cannot accept such an interpretation. . . . The 'fraud' standard is not required." *Cernocky*, 216 N.E.2d at 205.

The South Dakota Supreme Court's conclusion–that bad faith in a first-party insurance setting is unique–is further supported by its earlier statement in *Kunkel* that the "character and extent of the insurer's negligence" are properly considered when analyzing a bad faith claim. *Id.* at 726. Fraud-based claims do not involve the "character and extent" of the defendant's **negligence** as is allowed in an insurance bad faith claim.[3] Thus, *Kunkel* and its reliance on *Cernocky* establish that bad faith in an insurance setting is not a fraud-type of claim.

---

[2] American Family has deceptively omitted this crucial contextual language from its Brief.

[3] This is not to say that negligence alone can establish bad faith. Only that the "extent of the insurer's negligence" can be "considered" by the jury in determining whether bad faith exists. *See id.*

Rather, a first-party bad faith insurance claim exists "when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits." *Hill v. Auto Owners Insurance Co.*, 2015 WL 2092680, at *4 (D.S.D. May 5, 2015) (citation omitted). Insurers can engage in wrongdoing in non-fraudulent ways, such as when it refuses to consider information proving that more is owed under the policy, which is what American Family did to Haney. Moreover, unlike a workers' compensation bad faith claim, a first-party bad faith claim "can extend to situations beyond mere denial of policy benefits." *Dakota, Minnesota & Eastern R.R. Corp. v. Acuity*, 771 N.W.2d 623, 629 (S.D. 2009) (internal quotations and citation omitted) (hereafter *DM & E*).

In *DM & E* the South Dakota Supreme Court specifically adopted the Wisconsin Supreme Court's standard as articulated in *Anderson v. Continental Insurance Co.*, 271 N.W.2d 368, 377 (Wis. 1978):

> It is appropriate . . . to determine whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review. In the instant case, ***insofar as the complaint alleges, the insurer and the other defendants refused even to consider the nature and extent of the plaintiffs' damages, and specifically rejected and spurned the opportunity to evaluate and consider the submitted proof of loss. The pleading of the plaintiffs was sufficient in this respect.***

*Id.* at 630 (internal quotations omitted) (emphasis added). Notably absent from that standard is any reference to the traditional heightened pleading requirements when Rule 9(b) applies.

Furthermore, the South Dakota Supreme Court recently issued a decision that is more on-point. In *Mordhorst v. Dakota Truck Underwriters*, 2016 S.D. 70, --- N.W.2d ---, the workers' compensation insurer moved to dismiss the complaint for "fail[ing] to state a cause of action

upon which relief could be granted, and the circuit court granted the motion." *Id.* at ¶ 6. There, the Court acknowledged that, "[t]he relationship between a workers' compensation claimant and an insurer is adversarial and not contractual" and that "an action alleging [workers' compensation] bad faith requires more than an allegation of wrongful conduct." *Id.* at ¶ 9 (first alteration in original) (citing *Hein v. Acuity*, 731 N.W.2d 231, 237 (S.D. 2007)). Even in the workers' compensation arena, which requires "more than an allegation of wrongful conduct," the South Dakota Supreme Court did not apply any heightened pleading standards. *Id.* at ¶ 8. Instead, the Court applied the traditional "failure to state a claim" standard and asked "whether [the complaint] asserted facts that if true, establish the necessary elements of a bad-faith action." *Id.* at ¶¶ 8, 10. This decision, along with *DM & E*, *Anderson*, *Kunkel*, and *Cernocky*, establish that the heightened pleading standard in Rule 9(b) does not apply to a traditional first-party insurance bad faith claim.

First-party insurance bad faith claims are not fraud-based claims in that fraud has nothing to do with establishing a first-party insurance bad faith claim in South Dakota.[4] Rather, "there must be an absence of a reasonable basis for denial of policy benefits [or failure to comply with a duty under the insurance contract] and the knowledge or reckless disregard [of the lack] of a reasonable basis for denial[.]" *DM & E*, 771 N.W.2d at 629 (first two alterations in original) (quoting *Champion v. United States Fidelity & Guaranty Co.*, 399 N.W.2d 320, 324 (S.D. 1987)). "[T]he knowledge of the lack of a reasonable basis may be inferred and imputed to an

---

[4] This is not to say that fraud could never lead to a bad faith claim.

insurance company where there is . . . a reckless indifference to facts or to proofs submitted by the insured."  *Id.*  And "[b]ad faith conduct may include the failure to conduct a reasonable investigation concerning the claim."  *Id.* (citation omitted).

South Dakota is not alone in recognizing that bad faith in the insurance context is not based on fraud.  *See*, *e.g.*, *State Farm Mut. Auto. Ins. Co. v. White*, 236 A.2d 269, 272 (Md. 1967) ("[T]he courts do not intend to connote or imply by the use of the term ['good faith,' and its converse concept 'bad faith,'] that dishonesty, misrepresentation, deceit or a species of fraud must be present."); *Continental Ins. Co. v. Lynham*, 293 A.2d 481, 483 (D.C. 1972) ("'[B]ad faith' means any frivolous or unfounded refusal to pay; it is not necessary that such refusal be fraudulent.  And if probable cause is shown why payment should have been made, an inference of bad faith might thereby be raised." (quoting 3 Appleman, Insurance Law & Practice, s 1612 (1967), at 368-69)); *Indus. Indem. Co. of the Northwest, Inc. v. Kallevig*, 792 P.2d 520, 526 (Wash. 1990) (en banc) ("This fiduciary duty to act in good faith is fairly broad and may be breached by conduct short of intentional bad faith or fraud. . . . Thus, an insurer's denial of coverage, without reasonable justification, constitutes bad faith." (internal citations omitted)); *Yumukoglu v. Provident Life & Acc. Ins. Co.*, 131 F.Supp.2d 1215, 1226 (D.N.M. 2001) ("Bad faith in the context of an insurance claim has been defined [in New Mexico] as 'a frivolous or unfounded refusal to pay' by the insurer. . . . It is not necessary that the refusal to pay be fraudulent." (citations omitted)); *Quinn v. Liberty Mut. Gp.*, 2013 WL 842808, at *1 (E.D. Pa. Mar. 7, 2013) ("Pennsylvania courts have held that bad faith refers to 'any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be

fraudulent.'" (citation omitted)).  Other courts have expressly rejected the application of Rule

9(b) in the context of insurance bad faith claims.  *See*, *e.g.*, *Ragusa Corp. v. Standard Fire Ins.*

*Co.*, 2014 WL 1281314, at *5 (D.Conn. Mar. 27, 2014) ("Defendant has  not demonstrated that

bad faith (Count IV) and/or Connecticut statutory insurance-based claims (Count V) should be

held to Rule 9(b)'s particularity standard.")

Nothing about a first-party insurance bad faith claim requires fraud or some variation of

fraud.  Rather, only knowledge or recklessness with regard to the "absence of the reasonable

basis for denying the claim" by the insurer is needed.  *DM & E*, 771 N.W.2d at 629.  That has

nothing to do with fraud or fraudulent-like conduct, and neither does "fail[ing] to conduct a

reasonable investigation."[5]  *Id.*

An Alabama District Court Judge, Judge William H. Steele, does a thorough job

explaining why a bad faith insurance claim should not be subject to Rule 9(b)'s heightened

pleading requirements and why such an application is actually inappropriate in bad faith

insurance cases.  In *Austin v. Auto Owners Ins. Co.*, 2012 WL 3101693 (S.D.Ala. July 30, 2012),

the plaintiff alleged that she "suffered losses due to a windstorm which caused partial and/or total

destruction of premises . . .which losses were compensable under the terms of the policy."  *Id.* at

*1.  The complaint then alleged that "Auto Owners 'failed to properly adjust the claim and

summarily improperly paid the claim by only paying $844.91 for damage to the dwelling despite

obvious knowledge and evidence of serious cosmetic and structural damage, especially to

---

[5] Again, this is not to say that fraudulent conduct could never constitute bad faith.

Plaintiff's roof." *Id.* The insurer responded by making the same arguments that American Family makes here, that the complaint "does not comport with Rule 9(b)." *Id.* at *3.

In rejecting this argument in *Austin*, Judge Steele explained that the "defendant incorrectly imports pleading concepts for fraudulent misrepresentations into the bad faith context." *Id.* "Where fraudulent misrepresentations are concerned, Rule 9(b) requires that a plaintiff must plead what the false statement was, who said it, the circumstances in which it was made, and so on." *Id.* But, just like in South Dakota, "a bad faith claim does not require false or fraudulent statements at all." *Id.* And "[R]equiring [the insured] to plead misleading statements with specificity would be a futile and pointless gesture in this case because her claim is one of bad faith, not fraudulent statements." *Id.*

The Alabama District Court did not stop there. It went on to explain that "More generally, recall that, under Alabama law, a plaintiff bringing a 'normal' bad faith claim must establish the existence of an insurance contract, intentional refusal to pay the claim, absence of a debatable reason for such refusal, and defendant's knowledge of such absence of a debatable reason."[6] *Id.* And like the Complaint in this case, the amended complaint in *Austin* "specifically pleads the existence of a valid insurance policy, a covered loss, a timely claim, [insure's] refusal to pay same, and the absence of any debatable reason for denying [the] claim." *Id.* Any additional information is unnecessary in these types of cases. *Id.* ("From reading [the] pleading,

---

[6] This is the same as South Dakota law. *DM & E*, 771 N.W.2d at 629 ("[T]here must be an absence of a reasonable basis for denial of policy benefits [or failure to comply with a duty under the insurance contract] and the knowledge or reckless disregard [of the lack] of a reasonable basis for denial[.]").

Auto Owners is fully apprised of the specific policy (identified by number), loss (identified by date and physical address), and claim in question."). And nothing more is reasonably required for an insurer to prepare a defense. *Id.* ("Auto Owners does not reasonably require any further information in the pleading to prepare a defense centered on the lack of any policy with Austin, proper processing of her claim, or existence of debatable reasons for denying the claim[.]"). Thus, requiring "greater detail would be an empty action divorced from the specific objectives animating Rule 9(b)." *Id.*

> The *Austin* Court summed it up best as follows:
>
> In an ordinary fraud case, the Rule 9(b) who/what/when/where specificity is necessary to apprise the defendant of what it is alleged to have done wrong. Without knowing the particulars of the fraudulent statement it is accused of making, a defendant cannot respond properly. Here, however, [the insurer] knows exactly what Austin contends it did wrong, with regard to a specific policy number and claim, plus Austin's allegations that there was no arguable basis for not paying the claim and that [the insurer] knew it.

*Id.* at *3 n.7. *See also Scottsdale Indem. Co. v. Martinez, Inc.*, 2013 WL 360139, at *3 (N.D. Ala. Jan. 29, 2013) (" In [*Austin*], Judge Steele held that Rule 9(b) had no role in bad faith claims. . . . This court agrees with Judge Steele's reasoning [in footnote 7]."). Simply put, an insurer "is fully equipped to prepare a defense, and cannot plausibly profess to be in the dark as to [the insured's] claim" in these types of cases. *Austin*, 2012 WL 3101693 at *3 n.7. And "Rule 9(b) has no role " in straight forward insurance bad faith claims like the ones at issue in *Austin* and in this case. *See id.*

## II. The Complaint (Doc. 1) satisfies the heightened pleading requirements because it gives specific information about "when, where, what, who, and why."

American Family's Motion to Dismiss (Doc. 8) must be denied even under the heightened pleading standard. First, it must be noted that "the rule requiring that fraud be pled with particularity should be read 'in harmony with the principles of notice pleading.'" *Larson Mfg. Co. of South Dakota v. Connecticut Greenstar, Inc.*, 929 F.Supp.2d 924, 937 (D.S.D. 2013) (quoting *Schaller Tele. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002). The Complaint (Doc. 1) does this as evidenced by the fact that American Family was able to effectively respond in its Answer without suggesting confusion or insufficient information with regard to the merits. (Doc. 10.) Indeed, a review of American Family's Answer makes it clear that it fully understands what it is being accused of with regard to Haney's claim and who amongst its ranks were involved. (*Id*.)

Second, "[t]o satisfy the heightened pleading requirements, the complaint must specify the time, place, and contents of the false representations, the identity of the person making the misrepresentation, and what was obtained or given up." *Hill*, 2015 WL 2092680, at *9 (citing *Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 439 (8th Cir. 2013)). Stated differently, the Complaint needs to give American Family sufficient information about when, where, what, who, and why so that it can properly respond. American Family unquestionably knows this information simply by looking at the claims file. *See Austin* , 2012 WL 3101693 at *3 n.7 (explaining how an insurer "is fully equipped to prepare a defense, and cannot plausibly profess

12

to be in the dark as to [the insured's] claim" in an insurance bad faith case). Nonetheless, the

Complaint "informs" American Family of this information, twice:

**Time 1**:     July 2, 2014. (Doc. 1 at ¶¶ 10-13.)

**Place 1**:     In the letter by Adam Palace, on behalf of American Family, dated July 2,

2014. (Doc. 1 at ¶¶ 11-13.)

**Content 1**:     That American Family had investigated Haney's claim and that there was

little to no hail damage to sections of the roof.[7]  (Doc. 1 at ¶¶ 12, 24.)

**Identity 1**:     Adam Palace, an agent of American Family. (Doc. 1 at ¶ 11.)

**Obtained 1**:     American Family gained the continued use of money (benefits) that

rightfully belonged to Haney. (Doc. 1 at ¶¶ 30, 47, 48, 53, 54, 55.)

**Given up 1**:     Haney was deprived of his benefits (money) that he otherwise would have

received had American Family conducted a reasonable investigation. (Doc.

1 at ¶ 29, 34.)

**Time 2**:     August 4, 2016, and August 8, 2016. (Doc. 1 at ¶¶ 23-28.)

**Place 2**:     In the August 4, 2016 report by American Family, and the followup

August 8, 2016 letter from American Family.[8] (Doc. 1 at ¶¶ 23-28.)

---

[7]  As American Family's Answer states, "the letter dated July 2, 2014 speaks for itself[.]" (Doc. 10 at ¶ 12.)

[8]  As American Family's Answer states, "both reports . . . speak for themselves" and that "on or around August 8, 2016, AFMIC sent Plaintiff a letter concerning the August 2016 inspection of his roof and that this letter speaks for itself[.]" (Doc. 10 at ¶¶ 24, 27.)  Because American Family admits authoring these documents, they know the individual who wrote them.

**Content 2**:    That American Family relied exclusively on the August 4, 2016 report, that American Family completely ignored the July 11, 2016 report from Haney's roofer, and that American Family concluded that "Nothing additional is owed on your claim" even though American Family had objective information establishing otherwise. (Doc. 1 at ¶ 27-28.)

**Identity 2**:    Agents of American Family.[9] (Doc. 1 at ¶ 23, 27.)

**Obtained 2**:    American Family gained the continued use of money (benefits) that rightfully belonged to Haney. (Doc. 1 at ¶¶ 30, 47, 48, 53, 54, 55.)

**Given up 2**:    Haney was deprived of his benefits (money) that he otherwise would have received had American Family performed a reasonable investigation. (Doc. 1 at ¶ 29, 34.)

The above information, all of which is in Haney's Complaint (Doc. 1), satisfies Rule 9(b)'s heightened pleading requirements. Thus, the only remaining question is whether the Complaint fails to state a claim upon which relief can be granted under South Dakota law.

## III. First-party insurance bad faith claims are well recognized causes of action under South Dakota law.

"South Dakota courts have long held that a bad faith cause of action exists in the insurance context." *Double H Masory, Inc. v. Liberty Mut. Ins. Co.*, 2016 WL 5816997, *11 (D.S.D. Sept. 30, 2016). To avoid that tradition, American Family attempts to marginalize this

---

[9] Again, because American Family acknowledges that an agent wrote the August 4, 2016 report "At AFMIC's direction," (Doc 10 at ¶ 23), it knows the author's identity. The same is true with regard to the August 8, 2016 letter. (Doc. 10 at ¶ 27.)

case as a "mere" dispute over valuation. (Doc. 9 at 7-8.) In doing so, American Family omits or

misrepresents numerous factual allegations that establish American Family's bad faith. For

example, American Family states that the "Complaint merely alleges that: (1) Plaintiff's roof was

damaged in a hailstorm[.]" (Doc. 9 at 7.) The Complaint does not "merely allege" anything.

Rather, the Complaint alleges that "The June 2014 hail storm caused **extensive**,

**widespread**, functional, and **plainly visible** damage to Haney's shake shingle roof."[10] (Doc. 1 at

¶ 7 (emphasis added).) Once that allegation is accepted as true, which is required, the allegation

that American Family minimized the extent of the damage in its July 2, 2014 letter, (Doc. 1 at ¶

12), establishes that it "consciously engage[d] in wrongdoing during its processing or paying of

policy benefits." *Hill*, 2015 WL 2092680, at *4 (citing *Hein*, 731 N.W.2d at 235). That is,

American Family either did not conduct a reasonable investigation of the claim, or it did

investigate the claim but did not disclose the actual extent of the hail damage caused by the June

2014 hailstorm.

Failing to properly investigate a claim is bad faith in a first party insurance claim. *DM &

E*, 771 N.W.2d at 629 ("Bad faith conduct may include the failure to conduct a reasonable

investigation concerning the claim." (citation omitted)). *See also Walz v. Fireman's Fund Ins.

Co.*, 556 N.W.2d 68, 70 (S.D. 1996) ("Whether Insurer acted in bad faith in conducting an

inadequate investigation . . . is a question of fact for the jury[.]" (citation omitted)). And

---

[10] The bad faith claim specifically incorporates the facts and claim alleged earlier in the
Complaint "by reference as if fully set forth herein." (Doc. 1 at ¶ 52.) Thus, the bad faith claim
is based on the entire Complaint.

withholding information from an insured about the true extent of the covered damage is bad faith too. *Helmbolt v. LeMars Mut. Ins. Co., Inc.*, 404 N.W.2d 55, 58 (S.D. 1987) (explaining that an insurer cannot "ignore[] its duty of good faith for the purpose of protecting its own interest"); *Hill*, 2015 WL 2092680, at *7 ("[T]he insurance company must give equal consideration to the interests of its insured, ***even when those interests are adverse to its own***. Also, an insurance company may not ***'game' or manipulate its investigation*** or claims handling process to obtain a more favorable result ***at the expense of its insured***[.]" (emphasis added) (citing *Helmbolt*, 404 N.W.2d 55; *Trouten v. Heritage Mut. Ins. Co.*, 632 N.W.2d 856 (S.D. 2001)).) Either way, American Family acted in bad faith.

American Family states that "Noticeably absent from the Complaint, however, are any specific details regarding what investigation AFMIC performed, why that investigation was allegedly deficient, what claims handling procedures AFMIC utilized to evaluate and handle Plaintiff's claim, or why those procedures were unreasonable or problematic." (Doc. 9 at 8.) This is also not true.

Haney's Complaint contains factual details about why American Family's initial investigation was deficient, unreasonable, and problematic: American Family refused to pay for a new roof even though the roof sustained extensive, widespread, functional, and plainly visible damage from the June 2014 hailstorm and needed to be replaced as a result of that damage. (Doc. 1 at ¶¶ 7, 21, 22, 24, 25, 26.) Indeed, the Complaint goes on to allege that a subsequent investigation established the existence of "significant hail damage to the cedar shakes on the entire roof" and that the roof needed to be replaced as a result of the damage caused by the June

2014 hailstorm.  (Doc. 1 at ¶¶ 21, 22.)  And another American Family agent confirmed the existence of functional hail damage *on each slope, even though the July 2, 2014 investigation claimed that there was no hail damage to some of the slopes*.  (Doc. 1 at ¶ 24.)  Nonetheless, American Family told Haney in its August 8, 2016 letter that "Nothing additional is owed on your claim."  (Doc. 1 at ¶ 28.)  These facts provide the basis for the subsequent allegations that "American Family knew or recklessly disregarded the fact that $3,890.15 was not sufficient to repair Haney's shake roof" and that "American Family's purported July 2, 2014 investigation was not a reasonable investigation."  (Doc. 1 at ¶¶ 15, 17; *see also* Doc. 1 at ¶¶ 53-55.)

As to the absence of "specific details regarding" American Family's investigation, (Doc. 9 at 8), the Complaint alleges that "American Family refused to share all of the information that it obtained from its investigation of Haney's claim."  (Doc. 1 at ¶ 44.)  American Family undoubtably knows the "specific details" of its own investigation and is able to respond to the bad faith claim.  It should not be allowed to use the fact that it withheld information from Haney as a sword as it is attempting to do here.  *Cf. Larson*, 929 F.Supp.2d at 937 (denying motion to dismiss because some of the information was "peculiarly within the knowledge of the Defendants" and there was "adequate notice of the alleged . . . claim to allow Defendants to respond" when analyzing under Rule 9(b)).

American Family also suggests that Haney's claim is barred because he "accepted AFMIC's assessment of the damage" and otherwise waited too long.  (Doc. 9 at 8.)  Again, that is simply not true.  First, the Complaint never alleges that Haney "accepted AFMIC's assessment of the damage."  (Doc. 1.)  Second, the Complaint actually does the opposite in paragraphs 21

17

and 22 where it explains that the Haney's provided American Family with a report explaining

that the June 2014 hailstorm caused "significant hail damage to the cedar shakes on the entire

roof" and needed to be replaced as a result.  (Doc. 1 at ¶¶ 21, 22.)

American Family is of the belief that an insured's deposit of an initial check from his

insurer constitutes acceptance or acquiescence.  That is not the law in South Dakota as evidenced

by the lack of supporting legal authority.[11]  More importantly, allowing American Family to take

advantage of its insureds in such a way cannot be allowed.  Otherwise, American Family would

simply continue with its practice of issuing low-ball checks with the hope that the injured insured

will deposit the check, either out of desperation or ignorance.  That is not a defense; that is per se

bad faith.  *See Hill*, 2015 WL 2092680, at *7 ("Also, an insurance company may not 'game' or

manipulate its investigation or claims handling process to obtain a more favorable result at the

expense of its insured by virtue of the insurance company's superior bargaining power and

resources.").  Yet, that is what American Family appears to be doing when it argues that Haney

"accepted AFMIC's assessment of the damage" without any supporting citation or references.

---

[11]  Indeed, such a concept would directly contradict the fiduciary relationship that insurers owe their insureds.  *Trouten*, 632 N.W.2d at 864 ("[T]he relationship of the insurer to the insured is akin to that of a fiduciary since it must give at least as much consideration to the insured's interests as it does to its own.").  *See also Hill*, 2015 WL 2092680, at *7 ("[T]he insurance company must give equal consideration to the interests of its insured, ***even when those interests are adverse to its own***. Also, an insurance company may not ***'game' or manipulate its investigation*** or claims handling process to obtain a more favorable result ***at the expense of its insured***[.]" (emphasis added) (citing *Helmbolt*, 404 N.W.2d 55; *Trouten*, 632 N.W.2d 856).

American Family also repeatedly refers to the fact that two years went by between its initial "investigation" and its subsequent "investigation."[12]  (Doc. 9 at 1, 3, 8.)  First, breach of contract claims and insurance bad faith claims are subject to a six year statute of limitations.  *See* SDCL § 15-2-13(1); *Harms v. Cigna Ins. Co.*, 421 F.Supp.2d 1225, 1232 (D.S.D. 2006) ("apply[ing] the six-year limitations period in § 15-2-13(1) to Harms's bad faith claim, rather than the three-year limitations period contained in § 15-2-14(3)" because "the defendant's tortious acts allegedly deprived the plaintiff of insurance coverage").[13]  This is why American Family has not alleged, and could not allege, a statute of limitations defense.  (Doc. 10.)

Second, the reason two years went by is because American Family represented to Haney in the July 2, 2014 letter that there was little to no hail damage to the entire shake shingle roof.  (Doc. 1 at ¶ 10-12.)  Specifically, American Family told Haney that all of the hail damage could be fixed for $3,890.15.  (Doc. 1 at ¶ 13.)  However, the roof actually sustained extensive, widespread, functional, and plainly visible damage from the June 2014 hailstorm.[14]  (Doc. 1 at ¶ 7.)  American Family should not benefit from the fact that it almost got away with not paying the

---

[12]  Presumably this is why American Family has alleged laches as an affirmative defense. (Doc. 10 at ¶ 70.)

[13]  Indeed, American Family's insurance policy specifically states that a "suit against us must be brought within six years after the loss or damage occurs."

[14]  American Family may try to argue in its reply brief that Haney should not have waited two years if the hail damage was "plainly visible."  It must be remembered that, unlike the hood of a car, roofs are at least 10 feet high and often much higher.  Thus, while the hail damage was plainly visible if a proper inspection by someone with experience and/or training went on a roof, the hail damage may not be plainly visible to a homeowner standing on the ground.  This is why homeowners rely on their insurers to conduct full and fair inspections.

full amount of benefits by either not investigating the claim or minimizing the extent of hail

damage. As the South Dakota Supreme Court has explained, an insurer "should not be allowed

to take advantage of misrepresentations, if any, in order to avail itself of a shorter statute of

limitation." *Corner Constr. Co. v. United States Fidelity & Guar. Co.*, 638 N.W.2d 887, 896

(S.D. 2002).

American Family's argument that Haney acquiesced and waited too long actually

supports the "core" of Haney's bad faith claim. As Judge Schreier explained in *Hill v. Auto

Owners Insurance Co.*, 2015 WL 2092680 (D.S.D. May 5, 2015):

> The core of plaintiffs' bad faith claim is that [the insurer] designed its claims handling
> process to produce evidence that [the insurer] could use to unfairly deny valid claims,
> thereby forcing its insureds to take extra steps to obtain payment ***while hoping that
> enough people would be discouraged from pursuing benefits to enable [the insurer] to
> realize a profit at the expense of its insureds.***

*Id.* at *6 (emphasis added). Haney's Complaint includes factual allegations establishing this type

of bad faith conduct as well.

Specifically, the Complaint alleges that the June 2014 hailstorm caused extensive,

widespread, and plainly visible hail damage to Haney's roof. (Doc. 1 at ¶ 7.) And it alleges that

American Family nonetheless claimed that in a July 2, 2014 letter and report that there was little

to no hail damage to the entire roof. (Doc. 1 at ¶¶ 12-13.) If the Complaint ended there,

American Family's argument about there not being a systemic claims handling practice designed

to deny and delay may have at least some merit. But there is more, much more.

American Family conducted another inspection of Haney's roof on August 3, 2016.

(Doc. 1 at ¶ 23.) This was after it received additional information establishing "that there was

'significant hail damage to the cedar shakes on the entire roof'" and that $68,259.61 was needed to properly repair the damage caused by the June 2014 hailstorm. (Doc. 1 at ¶¶ 21-23.) That August 3, 2016 inspection, memorialized in an August 4, 2016 report, established that "$3,890.15 was not a reasonable amount to properly fix the hail damage to the shake shingles *because it found significantly more damage than the July 2, 2014 investigation disclosed*." (Doc. 1 at ¶ 25 (emphasis added).) That inspection also "established that 'Functional hail damage was evident on all slopes of this roof' *even though the July 2, 2014 investigation claimed that there was no hail damage to some of the slopes of Haney's home*." (Doc. 1 at ¶ 24 (emphasis added).) Even with this additional information, American Family told Haney in its August 8, 2016 letter that "Nothing additional is owed on your claim." (Doc. 1 at ¶ 28.)

That was read correctly: American Family had information from two sources confirming the existence of additional hail damage from the June 2014 hailstorm that was neither paid, nor disclosed, to Haney. (Doc. 1 at ¶¶ 21-26.) Nonetheless, it told Haney that "Nothing additional is owed on your claim" after receiving that information. (Doc. 1 at ¶ 28.) That is the epitome of a claims handling practice designed to deny and delay the payment of benefits owed under an insurance policy by "forcing its insureds to take extra steps to obtain payment while hoping that enough people would be discouraged from pursuing benefits to enable [the insurer] to realize a profit at the expense of its insureds." *Hill*, 2015 WL 2092680, at *6. Even worse, after Haney went through those extra steps, and after American Family received the information establishing that more was owed under the policy, American Family still refused to pay a penny more!

To get away with this, American Family asks this Court to follow the lead of an out-of-state case, *Plummer v. State Farm Fire & Casualty Co.*, 2014 WL 2960473 (W.D.Pa. June 27, 2014). American Family relies on *Plummer* because it also involved a hail claim. That is the only thing that *Plummer* has in common with this case.

In *Plummer*, "For the statutory bad faith claim at issue, plaintiffs' only well-pleaded factual allegations" involved allegations about a "neighbor across the street [who] received a claim payment from defendant[.]" *Plummer*, 2014 WL 2960473, at *6. The complaint did not include any factual allegations about the roof suffering severe, widespread, plainly visible hail damage. *See generally id.* Neither did that complaint contain any allegations about the insurer receiving ***additional information from two separate sources confirming that there was additional damage that the insurer had not paid for***. *See generally id.* And neither did that complaint allege that the insurer refused to pay anything more ***even though it had unquestionably underpaid the claim in light of the "new" information***. *See generally id.*

Further, *Plummer* is based on Pennsylvania law. And Pennsylvania law calls for a more stringent "clear and convincing" standard in analyzing insurance bad faith claims than South Dakota. "Under Pennsylvania law, the insured must prove bad faith on the part of the [insurer] by clear and convincing evidence . . . [that is] so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue[.]" *U.S. Fire Ins. Co. v. Royal Ins. Co.*, 759 F.2d 306, 309 (3d Cir. 1985) (internal citations and quotations omitted). *See also Plummer*, 2014 WL 2960473, at *5 (applying same standard). South Dakota uses the preponderance of the evidence standard when it comes to bad faith

insurance claims. *See Jennings*, 309 N.W.2d at 812 ("Rather than adopting a new burden of proof, the court in *Kunkel* was announcing that it would not require a greater burden of proof in bad faith cases[.]"). That heightened "clear and convincing" standard, Plummer's failure to include factual allegations about the extent of the hail damage, and the additional fact that American Family refused to pay anything more even after it received information confirming unpaid damages, make *Plummer* materially distinguishable and otherwise inapplicable to this case.

Rather than follow a Pennsylvania case applying Pennsylvania law, this Court should follow a South Dakota case applying South Dakota law.[15] After all, South Dakota State Courts apply the same *Iqbal/Twombly* standard under SDCL 12-15-6(b)(5) that federal courts apply under Rule 12(b)(6). *See Hernandez v. Avera Queen of Peace Hosp.*, 2016 WL 5636942, at *4 (quoting and applying *Twombly*). *See also Sisney v. Best Inc.*, 754 N.W.2d 804, 808-09 (S.D. 2008) ("Because SDCL 15-6-8(a)2 also requires a 'showing' that the pleader is 'entitled' to relief, we adopt the Supreme Court's new standards."). As discussed earlier, the South Dakota Supreme Court recently issued a decision in *Mordhorst v. Dakota Truck Underwriters*, 2016 S.D. 70, --- N.W.2d ---. In that case, a sofa fell off the back of a delivery truck and rendered the

---

[15] To the extent any non-South Dakota decision should be followed, the Alabama decision in *Austin*, 2012 WL 3101693, discussed above is better suited because it uses the same standard as South Dakota for establishing insurance bad faith and involves a similar low-ball claims handling allegation like the one alleged in this case. *See id.* ("The pleading sufficiently alleges a valid insurance policy, a covered loss, a timely claim, a lack of any reasonable basis for denying the claim, and knowledge of these facts by defendant. Accordingly, the Court finds no *Twombly/Iqbal* infirmity[.]"). Though, the Complaint in this case goes further and alleges that American Family still refused to pay anything more after subsequent investigations proved that more was owed. (Doc. 1 at ¶¶ 21-28.)

plaintiff temporarily unconscious.  *Id.* at ¶ 2.  The plaintiff waited a day to consult with his

medical providers.  *Id.* at ¶ 3.  The amended complaint alleged that his resulting "medical records

showed numerous objective findings consistent with Plaintiff's pain complaints[.]"  *Id.* at ¶ 11.

The insurer retained an independent medical examiner ("IME") as part of its investigation of the

claim.  *Id.* at ¶ 4.  The IME reported to the insurer that the plaintiff suffered "a 'strain' that

resolved 18 days after the accident."  *Id.*  The IME also concluded that the plaintiff's "subjective

complaints were not supported by objective findings."  *Id.*  Relying on the IME's conclusions,

the insurer denied any additional benefits.  *Id.* at ¶ 5. An insurance bad faith lawsuit followed.

The trail court dismissed the insurance bad faith claim "because it concluded 'that the

insurance company did have a reasonable basis for denial of policy benefits'" – the IME's report.

*Id.*  On appeal, the South Dakota Supreme Court acknowledged that "an action alleging

[workers' compensation] bad faith requires more than an allegation of wrongful conduct."[16]  *Id.*

at ¶ 9 (citation omitted).  Nonetheless, the Court still reversed the trial court's decision.

The insurer argued that it could not have committed bad faith because it had a report from

an IME doctor that provided a reasonable basis for the insurer's actions.  *Id.* at ¶¶ 10-11.  The

---

[16] A workers' compensation bad faith claim is different than a first-party bad faith claim.
"A bad faith cause of action based on an insurer's conduct in a workers' compensation case is not
traditional first-party bad faith."  *Hein*, 731 N.W.2d at 237.  In a first-party context like the one
currently before the Court, insurers owe their insureds an affirmative duty of good faith and fair
dealing:  "The South Dakota Supreme Court has recognized that insurance companies have a
responsibility to give equal consideration to the interests of insureds and may not force insureds
to resort to litigation to vindicate contractual rights."  *Hill*, 2015 WL 2092680, at *6 (citing
*Helmbolt*, 404 N.W.2d at 58).  This is because "'[t]he relationship of the insurer to the insured is
akin to that of a fiduciary[.]'"  *Id.* (quoting *Trouten*, 632 N.W.2d at 864).

South Dakota Supreme Court rejected that argument: "If [the plaintiff]'s assertion that his medical records exhibited numerous, objective findings to substantiate his complaint is true, then a jury could easily conclude that [the IME's] report did not provide a reasonable basis for denying [the] claim." *Id.* at ¶ 11. The same is true here: "If [Haney]'s assertion that his [shingles] exhibited numerous, objective findings to substantiate his complaint is true, then a jury could easily conclude that [the] report did not provide a reasonable basis for denying [the] claim." *See id.*

The Court also rejected the notion that insurers can avoid bad faith claims by relying on its agent's investigation of the claim. As the Court explained, "juries are routinely called upon to evaluate the opinions of experts–including medical practitioners–and to weigh those opinions against countervailing evidence." *Id.* at ¶ 12 (citation omitted). And there is "no reason to conclude that [the] insurer–whose chosen business deals in such matters–is incapable of the same." *Id.* "Therefore, an insurer's basis for denial is not necessarily reasonable simply because the insurer relies on the opinion of a[n investigating agent.]" *Id.*

Again, the same is true here because Haney's Complaint alleges that had American Family "performed a reasonable investigation and/or evaluation of Haney's claim, it would have known that $3,980.15 was not sufficient to repair the hail damage to Haney's shake shingle roof." (Doc. 1 at ¶ 20.) Moreover, the Complaint goes on to allege that American Family was subsequently provided with additional information confirming the existence of hail damage that American Family failed to pay for. (Doc. 1 at ¶¶ 21-25.) These assertions establish that American Family was aware of the fact that its initial determination that $3,980.15 was

25

insufficient and either consciously or recklessly disregarded it. *See Mordhorst*, 2016 S.D. 70 at

¶ 13 ("This assertion . . . necessarily implies that Insurers were aware of [the plaintiff's] medical

records including the MRI that revealed he suffered from a herniated disk.  Accepting this fact as

true, a jury could also conclude that Insurers recklessly disregarded this evidence in [its]

favor[.]").  As it was in *Mordhorst*, Haney has "stated a claim upon which relief can be

granted."[17] *Id.*

As this Court recently explained when expanding the tortious bad faith claim to apply in

the surety context, however, "the availability of a bad faith claim . . . act[s] as a type of 'check'

that is a reasonable means to deter bad faith handling of legitimate claims."  *Double H Masory,*

*Inc., v. Liberty Mut. Ins. Co.*, 2016 WL 5816997, at *10 (D.S.D. Sept. 30, 2016).  Allowing

American Family to turn this case into a "mere" breach of contract dispute would undermine any

"check" and turn South Dakota's bad faith insurance law into a nothing more than a paper tiger.

That cannot be allowed.

## IV.    Punitive damages are recoverable as part of an insurance bad faith claim.

It has been repeatedly recognized that punitive damages are allowed when there is a bad

faith insurance claim if the insurer acted with actual or presumed malice.  *Hill*, 2015 WL

---

[17]  This Court can also take judicial notice of other American Family cases with similar allegations involving the same hailstorm.  *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007) ("In this circuit, . . . [s]ome materials that are part of the public record . . . may be considered by a court in deciding a Rule 12(b)(6) motion." (citation omitted)).  The complaint in *Neugebauer v. American Family Mutual Insurance Co.*, 4:15-cv-04189-KES, also alleged facts to support the allegation that American Family had a "practice of limiting its payments to its insureds by failing to conduct a reasonable investigation and identifying an intentionally or reckless[ly] low amount of benefits owed under the policy."  *Neugebauer*, Doc. 1 (complaint) at ¶ 27.

2092680, at *8 (discussing recovery of punitive damages for bad faith conduct and citing cases).

"'An insurer's clear breach of contract or denial of a claim that is not fairly debatable may indicate malice.'" *Id.* at *8 (quoting *Bertelsen v. Allstate Ins. Co.*, 796 N.W.2d 685, 699 (S.D. 2011)). "'A claim for presumed malice can be shown by demonstrating a disregard for the rights of others.'" *Id.* (quoting *Selle v. Tozser*, 786 N.W.2d 748, 757-58 (S.D. 2010)). "Presumed malice may be inferred when a party acts willfully or wantonly and injures another." *Id.* (citing *Bertelsen v. Allstate Ins. Co.*, 833 N.W.2d 545, 555 (S.D. 2013) (abrogated on other grounds)). And willful and wanton misconduct occurs when an insurer "'intentionally failed to do something which he should have done under the circumstances that it can be said that he consciously realized that his conduct would in all probability, as distinguished from possibility, produce the precise result which it did produce and would bring harm to the plaintiff.'" *Id.* (quoting *Berry v. Risdall*, 576 N.W.2d 1, 9 (S.D. 1998)).

Haney's Complaint alleges that a American Family initially determined that the roof suffered little or no hail damage and that $3,890.15 was all that was owed to fix that damage.[18] (Doc. 1 at ¶¶ 10-13.)  The Complaint also alleges $3,890.15 was not a reasonable amount and that American Family knew that it was not sufficient to repair the damage because the hail damage was extensive, widespread, and plainly visible.  (Doc. 1 at ¶¶ 7, 14, 15.)  Those allegations establish a "clear breach of contract . . . that is not fairly debatable," which presumes

---

[18]  The punitive damages claim also specifically incorporates the facts and claims alleged earlier in the Complaint "by reference as if fully set forth herein."  (Doc. 1 at ¶ 56.)  Thus, contrary to American Family's argument otherwise, the claim for punitive damages does not only rely on boilerplate allegations or conclusory statements.

malice and allows for a punitive damages award. *See Hill*, 2015 WL 2092680, at *8 (quoting

*Bertelsen*, 796 N.W.2d at 699).

More importantly, American Family also refused to pay additional benefits that were

owed under the policy even after it was provided with information proving that its initial

$3,890.15 assessment was incorrect. (Doc. 1 at ¶¶ 21-25.) Specifically, "American Family

received a report from Haney's roofer explaining that there was 'significant hail damage to the

cedar shakes on the entire roof' and that "$68,259.61 was needed to properly repair the damage

caused by the June 2014 hailstorm[.]" (Doc. 1 at ¶¶ 21-22.) American Family's own subsequent

investigation confirmed that "'Functional hail damage was evident on all slopes of this roof'

even though the July 2, 2014 investigation claimed that there was no hail damage to some of the

slopes of Haney's home." (Doc. 1 at ¶ 24.)

When confronted with this information, American Family still refused to change its

position and concluded that "Nothing additional is owed on your claim." (Doc. 1 at ¶ 28.) These

allegations establish that American Family "intentionally failed to do something which [it]

should have done under the circumstances," i.e. pay additional benefits, "that it can be said that

[it] consciously realized that his conduct would" deprive Haney of his insurance benefits. *See*

*Hill*, 2015 WL 2092680, at *8 (quoting *Berry v. Risdall*, 576 N.W.2d 1, 9 (S.D. 1998)).

These allegations also establish that American Family has a systemic claims handling

practice designed to deny and delay the payment of benefits owed under an insurance policy by

"forcing its insureds to take extra steps to obtain payment while hoping that enough people

would be discouraged from pursuing benefits to enable [the insurer] to realize a profit at the

expense of its insureds." *Id.* at *6. And a punitive damages award is necessary to deter such

behavior because not allowing for the possibility of punitive damages "increases the incentive to

defendant to continue such behavior." *McElgunn v. Cuna Mut. Ins. Soc.*, 700 F.Supp.2d 1141,

1168 (D.S.D. 2010).

American Family's reliance on this Court's decision in *POET Investments Inc. v. Midwest*

*AG Enter., Inc.*, 2009 WL 790196 (D.S.D. Mar. 24, 2009), is misplaced for several reasons.

First, that case involved a "fraud and deceit" claim, which is different than an insurance bad faith

claim as explained earlier. *Id.* Second, the allegations to support the claim were as follows:

> It suggested facts that were not true, and did not believe them to be true; (2) It asserted, as
> facts, which were not true, and it had no reasonable ground for believing them to be true;
> (3) It suppressed facts and was bound to disclose facts, or who gave information of other
> facts which were likely to mislead for want to communication of the fact; and/or (4) It
> made promises without any intention of performing.

*See POET*, 08-4091, Answer and Counterclaim, Doc. 4 at ¶ 28. The *POET* counterclaim never

identified what the "suggested facts," "asserted facts," suppressed facts," or "promises" were.

*See generally id.* This is why the Court appropriately concluded that "these allegations

essentially encompass any type of representation, oral or written, made by Broin to Defendants"

and that "it is impossible for Plaintiffs to adequately respond to and prepare a defense to the

charges of fraud and deceit against them." *POET*, 2009 WL 790196, at *3. As discussed above,

the same cannot be said about the insurance bad faith claim against American Family.[19]

---

[19] It is also worth noting that none of the counterclaims in *POET* allowed for malice to be
proven by establishing a "'clear breach of [an insurance] contract or denial of a[n insurance]
claim that is not fairly debatable[.]'" *Bertelsen*, 796 N.W.2d at 699 ("An insurer's clear breach of
contract or denial of a claim that is not fairly debatable may indicate malice.").

Finally, unlike the counterclaims in *POET*, Haney's Complaint pleads "facts from which the court may infer the requisite state of mind." *Id.* Specifically, the Complaint alleges that American Family knew that "$3,890.15 was not sufficient to repair Haney's shake shingle roof" as evidenced by the extensive, widespread, functional, and plainly visible hail damage ***and the subsequent reports it obtained***. (Doc. 1 at ¶¶ 7, 15, 21-25.) And American Family intentionally refused to pay anything more even after it obtained this "new" information. (Doc. 1 at ¶ 28.) Those allegations also establish that American Family's claims handling process is designed to deny and delay paying the full amount of benefits that it owes under the insurance policy by identifying an intentionally low amount of benefits that it knows to be inadequate. (Doc. 1 at ¶¶ 16, 47, 48.) And that is sufficient for this Court to infer American Family's "state of mind" with regard to its handling of Haney's claim: intentionally withholding insurance benefits to protect profit margins.

## Conclusion

South Dakota law has a long tradition of protecting insureds, like Haney, from insurers, like American Family. The Complaint is detailed and clear about what American Family is accused of doing to Haney, which includes intentionally or recklessly low-balling Haney and refusing to pay anything more even when confronted with information proving that American Family underpaid Haney in light of the extensive, widespread, and plainly visible hail damage from the June 2014 hailstorm. That is bad faith and American Family needs to be punished so it stops happening. American Family knows it. Haney just needs the opportunity to present his case to a jury.

30

## Certification of Word Count

In accordance with Federal Rule 7.1(B)(1), I certify that this Brief, from the first sentence

on page 1 through the last sentence of the Conclusion on page 30, contains 8,890 words.

Dated: October 14, 2016.

FULLER & WILLIAMSON, LLP

/s/ Eric T. Preheim
Derek A. Nelsen
Eric T. Preheim
7521 South Louise Avenue
Sioux Falls, SD 57108
(605) 333-0003
dnelsen@fullerandwilliamson.com
epreheim@fullerandwilliamson.com
*Attorneys for Plaintiff*

## Certificate of Service

I certify that on October 14, 2016, I e-filed and served via CM/ECF Filer (PACER), a true
and correct copy of the foregoing Plaintiff's Brief in Opposition to Defendant's Motion to
Dismiss, upon:

Steven J. Morgans
MYERS BILLION, LLP
smorgans@myersbillion.com

-and-

Ross W. Johnson
FAEGRE BAKER DANIELS LLP
ross.johnson@faegrebd.com
*Attorneys for Defendant*

/s/ Eric T. Preheim
One of the Attorneys for Plaintiff